UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES OF AMERICA

       Plaintiff,

v.                                                               Case No. 8:14-cr-0140-T-23MAP

KEVIN BRIAN COX, THOMAS BIDDIX,
and LEONARD SOLT,

       Defendants.

_____/

## REPORT AND RECOMMENDATION

Before me is a shell corporation's motion to intervene in the criminal prosecution of its owner (Biddix). The motion, which Biddix's lawyers filed under the corporation's name, and which Biddix joins, seeks to shield allegedly privileged information that Biddix may later decide he will need in his defense (doc. 250). The government opposes the motion for a variety of reasons, including the obvious conflict the motion presents to the lawyers who advance its dubious merits (docs. 258, 329, S-338).   After hearing oral argument and reviewing the claimed privileged material *in camera*, I recommend the motion be denied because the corporation has neither the standing to intervene nor the grounds to assert the privilege.[1]

*A.  Background*

Biddix owned Associated Telecommunications Management Services, LLC (ATMS)

---

[1]  Biddix, for the reasons that will be explained, has no authority in any personal capacity to assert ATMS's attorney-client privilege for his own benefit.  Accordingly, I address only ATMS's standing and its authority to assert the privilege.  The district judge referred this motion to me for a report and recommendation.  28 U.S.C. § 636.

and is accused of using it and its related entities in a scheme to defraud the Federal Communications Commission (FCC) and the Universal Service Administrative Committee (USAC) in connection with the Lifeline Program.  *See* doc. 240.   During the course of the alleged scheme (January 2009 through April 2013), Biddix served as its board chair or its chief executive officer (doc. 240 at ¶ 11).  ATMS, however, ceased operating as early as 2011, Delaware revoked its corporate status in June 2013, and Florida revoked its corporate status in September 2013.  It has not done any business since then; it is not a defendant here; and it has no assets now.  Notwithstanding any business reason for a legal existence, Biddix resuscitated ATMS from its corporate death a month before his defense lawyers filed the instant motion.  Under the guise of ATMS's shell, ATMS's lawyers (or are they Biddix's lawyers?) ask the Court to prohibit the government from disclosing statements its employees made to interrogating FBI agents.   These statements purportedly deal with the advice ATMS's then-lawyers gave to ATMS's employees about ATMS's regulatory compliance with the Lifeline Program:

> Throughout 2009, 2010, and 2011 [the temporal period of the charged scheme], ATMS's officers – including defendant Thomas Biddix, Chairman; Chris Watson, Chief Executive Officer; Paul Watson, Chief Operations Officer; Bill Karp, Chief Financial Officer; Michael Brubaker, Chief Technonolgy Officer; and Steve Watson, Executive Director of ATMS subsidiary Lost Key Telecom – sought and obtained legal advice on behalf of the company or its subsidiaries related to business operations and federal and state regulatory issues, among other subjects.  *See* doc. 250 at 4, referencing Biddix's declaration at ex. 2.

ATMS's current stance on privilege, says the government, is at odds with the one that ATMS took during the regulatory and civil investigations that preceded the indictment.

Then, ATMS's lawyers (a different group than now) disclosed to regulators ATMS's views about the regulatory scheme and its compliance with the Lifeline provisions. *See* doc. 329 at 5-8. This earlier behavior reasonably suggests that Biddix, who after all was ATMS's agent then, will likely claim at the trial that he had always acted on advice of counsel.

But ATMS's regulatory-phase disclosures changed when the grand jury, in March 2011, issued its subpoena to the company. ATMS retained Stephen Spivack, an attorney at a Washington, D.C. firm, to help it respond to the subpoena. Spivack attests that in April 2011, he told the government ATMS would be withholding some documents from its production based on the attorney-client privilege and the work product doctrine (doc. S-293 at 26-27).[2]

Between 2011 and the indictment's return (April 2014), FBI agents interviewed current and former ATMS employees, with most interviews occurring before ATMS's 2013 dissolution. Of these, the government furnished the Defendants a number of 302s as a part of the government's *Brady* obligation.[3] After reviewing the 302s, Biddix concluded agents must have asked the interviewees about attorney-client privileged communications. His lawyers raised this issue with the lead prosecutor. Apparently, in late 2014 the prosecution

---

[2] ATMS did not produce a privilege log along with its document productions, and none of the documents ATMS produced to the grand jury are involved in ATMS's current motion.

[3] The Pretrial Discovery Order requires the government to timely disclose to the government that information required under *Brady* and *Giglio* (and their progeny). *See* doc. 51 at Part III. In view of the government's production, I make no finding as to whether the information produced qualifies as exculpatory information. The better practice for a prosecutor is to err on the side of production.

team created a taint team to review potentially privileged information.  Biddix's legal team and the taint team conferred, and the taint team redacted some statements but not others.[4] Biddix wanted more.  He resurrected ATMS and had his lawyers, acting through ATMS, file the instant motion to assert the privilege he could not personally raise, as the privilege belongs to a corporation, not its individual officers.  *See Commodity Futures Trading Comm'n v. Weintraub*, 471 U.S. 343, 348 (1985).  After I heard oral argument on the motion, the taint team agreed to redact additional statements; in total, the filter team agreed to 20 of ATMS and Biddix's 46 proposed redactions.

This juxtaposition – ATMS's current effort to shield these communications and Biddix's potential need for revealing the same in an advice-of-counsel defense – is constitutionally and ethically troubling.  The Sixth Amendment guarantees Biddix conflict-free counsel.  *Strickland v. Washington*, 466 U.S. 668, 692 (1984) (the right to effective assistance of counsel is impaired when defense counsel operates under a conflict of interest because "counsel breaches the duty of loyalty, perhaps the most basic of counsel's duties").  Fed. R. Crim. P. 44(c) requires a court to "promptly inquire about the propriety of joint representation."   Although the rule speaks to an attorney's joint representation of codefendants, the spirit of the rule applies here, particularly given ATMS's role in the

---

[4]  Whether the "taint team" correctly decided that these redacted portions are attorney-client privileged is not before me.   I also note that ATMS asserts the work-product doctrine.  I do not address this claim as ATMS did not develop this argument in the filings beyond stating the legal standard.  The proponent of the work-product doctrine has the burden of proof, and ATMS has not met that burden here.  *See Hickman v. Taylor,* 329 U.S. 495, 512 (1947).

alleged scheme.[5]   The ethical consequences the motion potentially poses are likewise obvious.   The Model Rules of Professional Conduct of the American Bar Association, as modified and adopted by the Supreme Court of Florida, govern the professional conduct of the lawyers appearing before this Court.   L.R. 2.04(d), M.D. Fla.   Florida Bar Rule 4-1.7 prohibits a lawyer from representing one client whose interests are adverse to another client unless certain exceptions apply (and none applies here).   All this is not lost on the government, who moves to preclude Biddix from raising an advice of counsel defense at trial (doc. 259) (government's motion in limine).[6]

   *B. Discussion*

      The typical motion to intervene in a criminal case involves a newspaper's effort to gain access to some aspect of the criminal trial a court has closed to the public.   The premise for the intervention is that the public and the press have a qualified, but important, constitutional right to attend criminal trials.   *United States v. Valenti*, 987 F.2d 708, 712 (11th Cir. 1993).   Obviously, our case does not fall within that example, but the example is illustrative for several reasons.   Intervention in a criminal case is an anomaly.   The intervenor must have an important right at stake, either in a representative capacity (*i.e.*, the press) or in a personal privilege or interest, and that right must be significant enough for society to value and protect.   In short, the intervenor's standing and the right it seeks to

---

[5]   Because I find that ATMS has no standing to assert the privilege and that none of the statements at issue is covered by the privilege, no conflict of interest exists, and a Rule 44(c) hearing is not required.

[6]   This motion was not referred to me for a report and recommendation.

protect are intertwined considerations.  ATMS, a dissolved and then revived legal entity, sits at the lower margins of society's legal protections, assuming it is entitled to any protection. As for its current effort, it has no standing to intervene to complain about statements that are not covered by the privilege it asserts.

*1.  standing*

To establish Article III standing, ATMS must show: injury-in-fact; a causal connection between the injury-in-fact and the opposing party's actions; and that the injury will be redressed by a favorable decision.  *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992); *Black Warrior Riverkeeper, Inc. v. U.S. Army Corps of Engineers,* 781 F.3d 1271, 1279 (11th Cir. 2015).  The requirement is that "the threatened injury must be *certainly* impending to constitute injury in fact." *Clapper v. Amnesty Int'l USA*, 133 S. Ct. 1138, 1147 (2013) (quotation and citations omitted).  The application of these principles so as to allow a third-party to intervene in a criminal prosecution is narrow.  No federal rule of criminal procedure speaks to intervention. When intervention is allowed in a criminal action, it is limited to instances where the third party's constitutional rights or other federal rights are implicated during the course of the prosecution.  *United States v. Martoma*, 962 F.Supp.2d 602, 605 (S.D.N.Y. 2013) (assertion of privilege to documents); *United States v. Carmichael*, 342 F.Supp.2d1070, 1072 (M.D.Ala. 2004) (summarizing limited cases).  But all these instances involved persons or active business entities; none dealt with a dissolved corporation whose revival occurred through the actions of the charged defendant.  Even when courts have been confronted with a defunct corporation's effort to intervene in a civil

matter to assert the privilege, the weigh of authority is against intervention.  *S.E.C. v. Carrillo Huettel LLP*, No. 13-cv-1735 (GBD), 2015 WL 1610282, at *2 (S.D.N.Y. Apr. 8, 2015) (collecting cases), *citing In re Fundamental Long Term Care, Inc.*, No. 8:11-bk-22258, 2012 WL 4815321, at *8-10 (Bankr. M.D. Fla. Oct. 9, 2012) (finding there was no privilege for the administratively dissolved company to assert); *see also Official Comm. of Admin. Claimants ex rel. LTC Steel Co., Inc. v. Moran*, 802 F.Supp.2d 947, 949 (N.D. Ill. 2011) (finding that absent a compelling reason, the attorney-client privilege does not survive the corporation's death because the company no longer has legal interests to protect).  This result is because "the interests that are furthered by the extension of the privilege beyond the death of a natural person simply do not apply in the context of a corporate entity." *Carrillo Huettel*, 2015 WL 1610282, at *2.  "The possibility that a corporation's management will hesitate to confide in legal counsel out of concern that such communication may become unprivileged after the corporation's demise is too remote and hypothetical to outweigh the countervailing policy considerations supporting discoverability." *Gilliland v. Geramita*, No. 2:05-cv-1059, 2006 WL 2642525, at *4 (W.D. Pa. Sept. 14, 2006).  Further, "there is no one who can speak for a defunct corporation in order to assert the privilege." *Carrillo Huettel*, 2015 WL 1610282, at *3.  Finally, "limiting the duration of the attorney-client privilege to the life of a corporation is consistent with the principle that the privilege is to be construed narrowly because it withholds relevant information from the judicial process." *Id.*[7]

---

[7]  Some cases holding that the privilege survives the dissolution of a corporation generally do so on the basis of state law.  *See Carrillo Huettel,* 2015 WL 1610282, at *4.  Other cases do so because the corporation is not dead, it continues in some other form (maybe in another state, for example, or in bankruptcy) and still has someone to speak for it.

The reasoning from these cases convince me that ATMS has no standing to intervene and no authority to assert the privilege here.  That ATMS dissolved with no legal successor to maintain operations, and no remaining management with authority to handle the company's post-dissolution wind-up, only reinforces the notion that it has no privilege to protect.  And that Biddix technically resurrected ATMS's legal status has no relevance here.[8]  *See LTV Steel Co.*, 802 F.Supp.2d at 949 ("To determine whether a corporation has 'died,' courts should look to practical business realities rather than technical legal status."); *see Lopes v. Vieira*, 688 F.Supp.2d 1050, 1067 (E.D. Cal. 2010) (finding that the defunct corporation's "ability to invoke or waive the attorney-client privilege does not exist in the fiction of its corporate survival …").  Just as important, ATMS asserts no valid reason for invoking the privilege.  It does not argue, for example, the company is protecting assets or goodwill.  Simply, there is no longer a viable corporate client to assert the privilege.  ATMS exists only paper; it cannot establish standing; and it cannot assert a privilege it no longer has to advance its owner's interests.

### 2.  attorney-client privilege

Even though I find ATMS lacks standing and lacks the ability to assert the privilege, I nonetheless address its claims about the communications at issue.  For this, ATMS contends its motion warrants an evidentiary hearing so that it can delve into the scope of the

---

[8]  ATMS was a Delaware corporation.  From that, it contends that Delaware's laws treat revived companies as if they were never cancelled (*see* doc. 250 at 14).  Federal common law governs claims of privilege in this case, not state law.  *See* Fed. R. Evid. 501.

FBI's intrusion (perhaps Biddix's real motivation for the motion).  I find that unnecessary for the reasons already outlined.  *See United States v. SDI Future Health, Inc.*, 464 F.Supp.2d 1027, 1047-56 (D. Nev. 2006) (denying request for evidentiary hearing on government's alleged intrusion into criminal defendant's attorney-client privilege); *In re Ampicillin Antitrust Litig.*, 81 F.R.D. 377, 390 (D.D.C. 1978) (special master did not commit error by failing to hold an evidentiary hearing as to the factual basis for assertions of the privilege); *cf. United States v. Schwimmer*, 892 F.2d 237, 245 (2d Cir. 1989) (finding an evidentiary hearing was required to determine whether the government violated defendant's attorney-client privilege because the district court made perfunctory findings based on an insufficient record); *United States v. Kleifgen*, 557 F.2d 1293, 1297 (9th Cir. 1977) (same).

### a.  privilege standards

The applicable standard is "the common law – as interpreted by United States courts in the light of reason and experience …"  Fed. R. Evid. 501.  The privilege applies only to communications and does not extend to facts.  *Upjohn Co. v. United States*, 449 U.S. 383, 395 (1981).  Because it obstructs the truth-seeking process, courts narrowly construe its coverage consistent with its purpose.  *Fisher v. United States*, 425 U.S. 391, 403 (1976); *United States v. Noriega*, 917 F.2d 1543, 1551 (11th Cir. 1990).

The party invoking the privilege must establish by a preponderance that: (1) the asserted holder of the privilege is or sought to become a client; (2) the person to whom the communication was made was a licensed attorney or her subordinate acting in the capacity of a lawyer at the time the communication was made; (3) the communication concerns a fact

that was communicated to the attorney by his client outside the presence of strangers; (4) for the purpose of obtaining a legal opinion, legal services, or assistance in a legal proceeding; (5) the communication was not made for the purpose of committing a crime or tort; (6) the professed holder actually claimed the privilege; and (7) he did not waive the privilege. *Daubert v. Merrell Dow Pharm.*, 509 U.S. 579 (1993), *In re Fed. Grand Jury Proceedings 89-10 (MIA)*, 938 F.2d 1578, 1581 (11th Cir. 1991). For the privilege to apply, the communication must be confidential, meaning the professed holder "(1) intended [the communication] to remain confidential and (2) under the circumstances [the communication] was reasonable expected and understood to be confidential." *Noriega*, 917 F.2d at 1551. Stated another way, the key elements of the privilege are (1) the attorney; (2) the client; (3) a communication; (4) the confidentiality that was anticipated and preserved; and (5) the legal advice or assistance that was the primary purpose of the communication. *United States ex rel. Baklid-Kunz v. Halifax Hosp. Med. Ctr.*, No. 6:09-cv-1002-Orl-31TBS, 2012 WL 5415108, at *2 (M.D. Fla. Nov. 6, 2012). The privilege belongs to the client, who can waive it expressly or implicitly. *Cox v. Adm'r U.S. Steel & Carnegie*, 17 F.3d 1386, 1417 (11th Cir.), *modified on other grounds*, 30 F.3d 1347 (11th Cir. 1994). Once waived, the holder cannot reassert it. *Id*. The privilege should be used "as a shield, not a sword." *Id*. Courts have found waivers by implication in three sets of circumstances: (1) when a client testifies concerning portions of the attorney-client communication; (2) when a client places the attorney-client relationship directly at issue; and (3) when a client asserts reliance on an attorney's advice as an element of a claim or defense. *Id*. at 1419.

10

The attorney-client privilege applies to corporations and protects communications to corporate counsel for obtaining legal advice, protecting not only the advice of the attorney to the client but also the information communicated by the client that provides a basis for the advice. *Weintraub*, 471 U.S. at 348; *see also Upjohn*, 449 U.S. at 390. It extends to officers and agents responsible for directing the company's response to legal advice, as well as to mid-and lower level employees who have information needed by corporate counsel to render legal advice. *Upjohn*, 449 U.S. at 390-91.

A presumption of privilege cloaks communication between corporate client and outside litigation counsel. But communications between corporate client and corporate counsel, on the other hand, "involve a much different dynamic and require the proponent to satisfy a 'purpose and intent' threshold test." *Halifax Hosp. Med. Ctr.*, 2012 WL 5415108, at *3. "[M]odern corporate counsel have become involved in all facets of the enterprises for which they work. As a consequence, in-house legal counsel participates in and renders decisions about business, technical, scientific, public relations, and advertising issues, as well as purely legal issues." *In re Vioxx Prods. Liab. Litig.*, 501 F. Supp. 2d 789, 797 (E.D. La. 2007). Consequently, general "[b]usiness advice, unrelated to legal advice, is not protected by the privilege even though conveyed by an attorney to the client," because the purpose and intent is not to communicate legal advice. *Id.*

Simply funneling a non-privileged communication through an attorney does not "automatically encase the document in the privilege." *Halifax Hosp. Med. Ctr.*, 2012 WL 2012 WL 5415108, at *3. The communication must request legal assistance and the

11

information conveyed must reasonably relate to that assistance. *Tyne v. Time Warner Entm't Co.*, 212 F.R.D. 596, 600 (M.D. Fla. 2002). The privilege also extends to communications between corporate employees who transmit legal advice to those who have a need to know in the scope of their corporate responsibilities, *In re Vioxx*, 501 F. Supp. 2d at 797, and may extend to protect "information gathered by corporate employees for transmission to corporate counsel for the rendering of legal advice." 1 Edna Selan Epstein, *The Attorney-Client Privilege and the Work Product Doctrine* 151-52 (5th ed. 2007). However, any privilege that exists as to a corporate officer's role and function within a corporation belongs to the corporation, not the officer. *Weintraub*, 471 U.S. at 348-49. Consequently, while officers and directors have the authority to assert (and therefore waive) the privilege, former officers and directors do not. *See id.* Indeed, a former manager cannot assert an attorney-client privilege on behalf of a corporation as a shield to protect his self-interest. *Id.* at 353-54.

### b. application of standards

The *in camera* items, which are the relevant portions of FBI 302s , appear in the attached Appendix, which is sealed from the public, the prosecution team, and Biddix's co-Defendants until the Court can review the Report and Recommendation and decide accordingly. My reasons for the sealing are two-fold: a court's review of communications that may be privileged is historically an *in camera* task; likewise, items disclosed during the discovery phase of a criminal case are usually kept from the public's view, at least until the need for secrecy passes. *See Valenti*, 987 F.2d at 712. That said, and applying the standards

12

applicable to the privilege in the corporate setting, none of the referenced portions reveal attorney-client protected communications, assuming ATMS has standing and possesses the authority to maintain the privilege.

C.  Conclusion

For the reasons stated, ATMS's motion to intervene and for protective order (doc. 250) should be DENIED.

IT IS SO RECOMMENDED in Tampa, Florida on October 7, 2015.


MARK A. PIZZO
UNITED STATES MAGISTRATE JUDGE


**NOTICE TO PARTIES**

A party has fourteen days from this date to file written objections to the Report and Recommendation's factual findings and legal conclusions.  A party's failure to file written objections waives that party's right to challenge on appeal any unobjected-to factual finding or legal conclusion the district judge adopts from the Report and Recommendation.  See 11th Cir. R. 3-1.